David W. Gadd (ISB #7605)
Kelly H. Andersen (ISB#10511)
STOVER, GADD & ASSOCIATES, PLLC
905 Shoshone Street North
P.O. Box 1428
Twin Falls, Idaho 83303-1428
Telephone: (208) 736-9900
Facsimile: (208) 736-9929
dwg@magicvalleylaw.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LINDSEY YEAMAN, an individual<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BURLEY, an Idaho municipal corporation, and DEE HODGE, an individual,<br><br>Defendants. | Case No. 1:21-cv-345 _____<br><br>**COMPLAINT**<br><br>**42 U.S.C. § 2000e**<br><br>**JURY TRIAL DEMANDED** |

COMES NOW the plaintiff, Lindsey Yeaman, by and through her undersigned counsel, the firm STOVER, GADD & ASSOCIATES, PLLC, and for a cause of action against the above-named defendants, complains and alleges as follows:

## I.
## PARTIES, VENUE, JURISDICTION

1. Lindsey Yeaman ("Yeaman") is an individual residing in Burley, Idaho.

2. City of Burley ("City") is an Idaho municipal corporation.

3. Dee Hodge ("Hodge") is an individual residing in Heyburn, Idaho.

4. Venue is proper in this court under 28 U.S. Code § 1391.

5. Jurisdiction is proper under 28 U.S. Code § 1331 as a civil action arising under

**COMPLAINT – Page 1**

the laws of the United States.

## II.
## FACTUAL ALLEGATIONS

6. Yeaman realleges by reference each and every allegation contained in the above paragraphs and incorporates the same as if fully set forth herein.

7. Yeaman was hired as a wastewater lab technician by the City's Wastewater Department on or about May 24, 2014.

8. The City gave Hodge authority to supervise Yeaman.

9. The City gave Hodge the power to hire, fire, and change the terms and conditions of Yeaman's employment.

10. On numerous occasions from 2015 until 2018, Hodge made sexual advances towards Yeaman based on her sex. These advances included reaching his hand down Yeaman's shirt, crude comments, pet names; frequent requests to go for "rides" with Hodge in his truck; frequent resting of hands on Yeaman's shoulders, lower back, hands, and arms; placement of crude objects in the office; referencing items in Yeaman's work area as sexual items, and demands on how Yeaman must wear her clothing around him.

11. As Yeaman continually rejected Hodge's unwanted sexual advances, Hodge became increasingly hostile.

12. The sexual harassment shifted in 2018 from sexual advances and hostile behavior to hostile behavior against Yeaman for her repeated refusal to accept the sexual advances.

13. Hodge's hostile behavior included yelling, threatening to fire Yeaman, deleting and/or changing her work on the office computer, humiliation, isolation, bullying, sabotaging, denial of the code necessary to send or receive access to pretreatment information from the DEQ, denial of permission to attend quarterly pretreatment roundtable trainings, and giving incorrect

information or failing to provide necessary information in a timely manner.

14. This hostile behavior included a meeting with Yeaman and Anderson of human resources. At that meeting, Yeaman was informed by Hodge that she was to keep her door open at all times and that she, unlike her male colleagues, was not allowed to wear a baseball cap at work.

15. Hodge allowed male coworkers of Yeaman to take time off even after they exhausted their allocated days.

16. Hodge often belittled Yeaman for her use of her sick days to care for her quadriplegic son despite the fact that Yeaman never exceeded her allotted sick days.

17. The City kept Hodge in his supervisory position despite knowledge of his abusive behavior towards those that he supervised.

18. Hodge presented Yeaman with a work phone. He informed her that she needed to keep the phone with her at all times as she would be on call at all times. Hodge refused to provide compensation for Yeaman's on-call hours, even though compensation was provided for on call hours worked by her male coworkers.

19. In the summer of 2018, the Pretreatment Coordinator retired. Yeaman was promoted to that position.

20. Hodge's harassment against Yeaman greatly intensified upon the retirement of her predecessor.

21. As Pretreatment Coordinator, Yeaman was tasked with writing new permits, a task she was never trained to perform. Yeaman was also required to retain most of the duties of her prior job. Hodge required Yeaman to run all of the labs for a co-worker who was out on maternity leave.

**COMPLAINT – Page 3**

22. The pretreatment program that Yeaman was given at the time of her promotion was not in compliance with appropriate regulations.

23. Yeaman was tasked with adapting the permits to comply with the new sewer use ordinance and the municipal plant new permit. This required the creation of additional documentation for program compliance such as permit applications for industrial users.

24. Yeaman was also tasked with managing the historic transition from Environmental Protection Agency ("EPA") oversight to Idaho Department of Environmental Quality ("DEQ") oversight.

25. Yeaman was given the responsibility to bring the existing pretreatment program into compliance. She had to use the new plant permit and new sewer use ordinance to create industrial customer permits that would comply with the DEQ requirements.

26. In approximately August of 2019, Hodge informed Yeaman that he changed his mind and he determined that the City was not going to pay for a qualified professional to write the initial necessary permit and other documents. A qualified professional was not made available to bring the wastewater program into compliance with DEQ standards.

27. Hodge informed Yeaman that she would be required to write the new permits and bring the pretreatment program into compliance with new DEQ despite her lack of training and without oversight or assistance from himself or a qualified professional.

28. On or about January 6, 2020, Yeaman made a formal complaint about Hodge to Carol Anderson ("Anderson") of the City's Human Resource Manager, regarding Hodge's behavior.

29. Yeaman recounted to Anderson the deletion of work by Hodge, intimidating behavior of Hodge, forging of wastewater permits by the previous Pretreatment Coordinator with

the knowledge of Hodge, isolation from coworkers imposed by Hodge on Yeaman, denial of assistance from a pretreatment consultant by Hodge, being placed on call without compensation, disparaging comments, retaliation and not providing the information necessary to perform her job.

30. Yeaman was not allowed by Anderson to complete her report of Hodge's behavior. Anderson interrupted Yeaman. Anderson then invited Mark Mitton ("Mitton"), City Administrator/Pretreatment Administrator, to be present.

31. Anderson instructed Yeaman to repeat all of the allegations she had made against Hodge. Yeaman started to repeat the allegations against Hodge.

32. Mitton interrupted Yeaman before she could complete her report.

33. Mitton announced that he did not have time to hear Yeaman because he had an upcoming vacation to Hawaii.

34. Mitton asked Yeaman how long it would take her to rewrite a permit and told her that Dustin Rainey could supervise her instead of Hodge.

35. At that time, Mitton, the Pretreatment Administrator, told Yeaman that he had not heard anything negative about her job performance.

36. As the Pretreatment Administrator, Mitton had responsibility over the Pretreatment program.

37. At no time after Yeaman's report to Anderson was Hodge placed on leave pending an investigation into her allegations.

38. At no time after Yeaman's report to Anderson, did Anderson, Mitton or anyone at the City contact Yeaman to see whether the situations that she had reported had improved.

39. On or about January 14, 2020, Yeaman received a negative employee evaluation.

40. On or about January 31, 2020, Hodge arrived at Yeaman's office with Anderson. He loudly announced to the office that Yeaman was terminated.

41. This announcement was incorrect. Yeaman was not terminated at that time. Hodge had provided her with a Notice of Proposed Termination.

42. Yeaman's co-worker, Dan Pherigo ("Pherigo"), became aware that Hodge's harassment of Yeaman was not limited to yelling and insults but included sexual advances.

43. On February 3, 2020, Pherigo reported Hodge's sexual harassment of Yeaman to Anderson.

44. Immediately after Pherigo's report of Hodge's sexual harassment, Pherigo was placed on administrative leave.

45. At no point in time following Pherigo's report was Hodge placed on leave pending an investigation into the claims of hostile behavior or sexual harassment.

46. On February 10, 2020, Yeaman attended a hearing regarding her proposed termination.

47. Yeaman's harasser and supervisor, Hodge, presided at her termination hearing.

48. Anderson and Yeaman's co-worker also attended the termination hearing.

49. On or about February 13, 2020, Yeaman answered the front door of her residence and found Anderson.

50. Anderson handed Yeaman a termination letter and said, "Here's Dee's [Hodge's] decision."

51. Hodge sat in a City truck parked in front of Yeaman's house and witnessed Anderson deliver Yeaman's termination letter.

### III.
### SEXUAL HARASSMENT/HOSTILE WORK ENVIRONMENT

**(City of Burley, Hodge)**

52. Yeaman realleges by reference each and every allegation contained in the above paragraphs and incorporates the same as if fully set forth herein.

53. Yeaman is a woman, a member of a protected class.

54. Yeaman was subjected to a hostile and abusive work environment because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*.

55. The sexually offensive acts and statements to which Yeaman was subjected were unwelcome and were not invited or solicited by Yeaman's own acts or statements.

56. This sexual harassment began with sexual advances and developed into yelling and abusive behavior as Yeaman continually refused Hodge's advances.

57. The acts and statements of Yeaman's supervisor, Hodge, materially altered the conditions of her employment.

58. A reasonable person would have found the workplace to be hostile and abusive.

59. Yeaman found the workplace to be hostile and abusive.

60. This hostile work environment was created by a supervisor with higher authority over Yeaman.

61. The hostile work environment was permitted by the City.

62. Yeaman suffered damages as a proximate and legal result of the hostile and abusive work environment including, but not limited to, insufficient job training, sabotage of her work and mental distress.

**IV.**
**RETALIATION**
**(City of Burley, Hodge)**

63. Yeaman realleges by reference each and every allegation contained in the above paragraphs and incorporates the same as if fully set forth herein.

64. Yeaman rejected Hodge's frequent sexual advances.

65. After Yeaman's continued rejection of Hodge's sexual advances, he continued to harass her and retaliate against her by deleting her work, providing insufficient training, yelling at her, providing her with incorrect work information and limiting her interactions with other employees.

66. Yeaman reported Hodge's hostile actions and abusive behavior to the City through Anderson and Mitton.

67. Shortly this report, Yeaman received a negative employee evaluation.

68. Pherigo then reported Hodge's sexual advances against Yeaman to Anderson and the fact that the hostile behavior by Hodge was a result of Yeaman's rejection of Hodge's sexual advances.

69. After the report from Yeaman regarding Hodge's abusive behavior and after the report from Pherigo regarding Hodge's sexual harassment of Yeaman, the City authorized Hodge to preside at Yeaman's termination hearing and make a determination regarding her employment status.

70. This termination was a result of Yeaman's rejections of Hodge's harassment and the reports of his abusive behavior.

71. Yeaman was subjected to adverse employment decisions as a result of her report of Hodge's behavior including being subjected to a hostile work environment, restrictions placed on her which were not placed on her coworkers, negative employee evaluation and termination.

72.     These adverse employment decisions caused Yeaman to incur damages including lost wages and non-economic damages.

## ATTORNEY'S FEES

73.     Yeaman realleges by reference each and every allegation contained in the above paragraphs and incorporates the same as if fully set forth herein.

74.     Due to Defendants' actions, Yeaman has been required to retain the services of counsel and has retained the firm of STOVER, GADD & ASSOCIATES, PLLC, to prosecute this action. Should Yeaman be successful in this action, Defendants, in addition to being responsible for Yeaman's costs incurred herein, should be responsible for Yeaman's reasonable attorney's fees incurred herein including, but not limited to, 42 United States Code section 2000e-5(k)

WHEREFORE, Yeaman respectfully prays for judgment against the City and Hodge as follows:

1. That Yeaman recover from the City for the sexual harassment and retaliation in an amount to be determined at trial.

2. That Yeaman recover from Hodge for sexual harassment and retaliation in an amount to be determined at trial.

2. That Yeaman recover her costs and attorney's fees from the City and/or Hodge.

3. For such other and further relief as the Court deems just under the circumstances.

DATED this 24 day of August, 2021.

> STOVER, GADD & ASSOCIATES, PLLC
>
> By /s/ David W. Gadd
>     David W. Gadd
>     Attorneys for Plaintiff