BLAKE G. HALL, ESQ.
SAM L. ANGELL, ESQ.
DILLON S. ERICKSON, ESQ.
HALL ANGELL & ASSOCIATES, LLP
1075 S Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Telephone (208) 522-3003
Fax (208) 621-3008
*ISB Nos. 2434, 7012 and 10312*
bgh@hasattorneys.com
sla@hasattorneys.com
dse@hasattorneys.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LINDSEY YEAMAN, an individual, | Case No. 4:21-cv-345 |
| Plaintiff, | **DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF BURLEY, an Idaho municipal corporation; and DEE HODGE, an individual, | |
| Defendant. | |

I, SAM L. ANGELL hereby swear under penalty of perjury as follows:

1.      I am over eighteen years of age and I make this declaration based upon my own personal knowledge unless otherwise stated.

2.      I am one of the attorneys of record for Defendants.

3.      On June 10, 2022, Defendant took the deposition of Plaintiff Lindsey Yeaman on the facts of this matter. Attached hereto as Exhibits A–G are true and correct copies of relevant excerpts of Plaintiff's deposition.

Dated this 29th day of November, 2022.

_____
SAM L. ANGELL

DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 1

## CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the foregoing document upon the following this 29th day of November, 2022, by the method indicated below:

Kelly H. Andersen, Esq.                    [X] CM/ECF
David W. Gadd, Esq.
STOVER GADD & ASSOC.
PO Box 1428
Twin Falls, ID 83303
Email: kha@magicvalleylaw.com
Email: dwg@magicvalleylaw.com

_Sam Angell_
SAM L. ANGELL

# EXHIBIT A

his head on my shoulder, "What's you doing, Lindsey Bob?"

Jean's first day of retirement was the last touching incident or offers of any rides.  Not offers, requests.

I was going through things.  I had a standing shelf, bookshelf [indicating].  I'm putting my hands up so that you can see the height of it.  I was standing.  And I'm going through paperwork, the paperwork that Jean had, and still had, it was beyond outdated.  It was garbage.

So I was kind of going through that and cleaning out those things and organizing.  And I was standing here [indicating].  I have a drawer open, and I'm going through the files that I need to probably just verify is this -- you know, I mean it's showing me it's from some other town, some other -- it wasn't nothing to do with our city.

I had just placed -- shut the drawer.  I placed my hand up here [indicating] and had sat my last piece of -- my folder down.  I'm using a piece of paper.  I set it like this case [indicating].  He came up behind me, put his hand here [indicating], his left hand on top of my left hand, and then took his right hand and put it on my lower back.  I turned my body

Q.    Anything else?

A.    No, not after her responses of what I'd already told her.

Q.    And then she retired on -- what was her retirement date?

A.    I believe that was July 18th.

Q.    Of --

A.    It was a Friday.

Q.    Of 2018?

A.    Yes.

Q.    And then after that you say Hodge didn't touch you anymore after that?

A.    On the first day that it was just -- she was retired.

Q.    You told me about that, yes.

A.    Yeah.

Q.    Beyond that, he didn't touch you again?

A.    No.

Q.    Did he make any more offers for rides?

A.    No.

Q.    Did he make any more inappropriate, sexual innuendo after that?

A.    No.

Q.    Okay.  Now, did you end up getting the job that Jean Gorringe left?

# EXHIBIT B

bullying, the comments, the sabotaging.

Q.   Let's be clear.  I need to work through this.  You've given me a very lengthy answer.  I need to work through parts of that, but I need to be real clear and maybe just cut to the chase a little bit.

The comments you have made about the harassment related to Dee Hodge, you did not report any of that to Carrol Anderson prior to 2020; correct?

A.   For the full -- no.  Correct.

Q.   Nothing about the touching of the shoulders, the reaching down your shirt was reported to HR?

A.   Correct.

Q.   The only things you had reported to HR is what you told me earlier, you complained about your denial of some time off, unpaid leave, the smoking cessation class, and that little bit about your trip to Utah when he questioned you about accepting leave; is that right?

A.   So far, yes.

Q.   So I want to make sure, you did not report any of these other issues you had with Dee Hodge to Carrol prior to 2020?

A.   No.

Q.   Same set of questions for Mark Mitton, you

go get coffee, which everybody did.  I was not, in general, allowed to leave the building unless I kept in complete contact with him.

And then eventually he -- he wouldn't even respond.  But if I had to go help Chelsey with a sampler at the other plant, at the industrial plant, which is you have to drive a little ways away to get to that, he would just come over and just sit, watch, and then would accost me for that.  He came out yelling at me.  I told her about that.  His abusive tone, his abusive face, his hostility.

Q.    Is that it?

A.    Yes.

Q.    And just to be clear, you did not at that time choose to report any of this alleged sexual harassment; correct?

A.    Correct.

Q.    Then after you left that meeting, the City, did they let you know they were going to do an investigation or anything like that?

A.    They said that they would bring Dee and Dustin in.  I had assumed that would be separately.  As it turned out, they were both put in the room together while that questioning was happening.  And Dee was told that he --

# EXHIBIT C

bullying, the comments, the sabotaging.

Q.    Let's be clear.  I need to work through this.  You've given me a very lengthy answer.  I need to work through parts of that, but I need to be real clear and maybe just cut to the chase a little bit.

The comments you have made about the harassment related to Dee Hodge, you did not report any of that to Carrol Anderson prior to 2020; correct?

A.    For the full -- no.  Correct.

Q.    Nothing about the touching of the shoulders, the reaching down your shirt was reported to HR?

A.    Correct.

Q.    The only things you had reported to HR is what you told me earlier, you complained about your denial of some time off, unpaid leave, the smoking cessation class, and that little bit about your trip to Utah when he questioned you about accepting leave; is that right?

A.    So far, yes.

Q.    So I want to make sure, you did not report any of these other issues you had with Dee Hodge to Carrol prior to 2020?

A.    No.

Q.    Same set of questions for Mark Mitton, you

A.    Yes.

Q.    Okay.  I just wanted to make sure you recognized it before we talk about it.

Now, there's many handwritten notes on the left-hand side.

Who's handwriting is that?

A.    This was me.  So this was a copy of a copy.

Q.    Okay.  And this notice of termination was dated January 31st, 2020; correct?

A.    Correct.

Q.    I want to go back.  Before we go through this document, just to keep our timeline straight, I want to go back and ask you what it is that you reported to the City when you went in with Dan Pherigo on January 6th, 2020.  You had kind of told me about that earlier.  I stopped you.  I'd rather get it now so I have a complete understanding of what it is you reported.

So the best that you can tell me, what are the issues you reported to the City on January 6th, 2020?

A.    What I recall reporting was the intimidation, bullying, sabotaging my work, not giving me the correct information or withholding information, the different set of rules that I had that only applied

to me.  The isolation.

I reported that I had three years of my journals in my lap.  I reported I wanted it to stop, all of it to stop.  I advised her on -- I talked with her about, again, the deletion of my work, not giving me the access to a consultant that was to be given.

I talked with her about the continual job threats that I'd lose my job.  I brought up -- I wasn't aware if she knew or not, but I brought up that I was sent out of town on my first conference with $63 for a four-day conference.

And I went into the details of the different types of treatment and the different things that were not provided to me to be able to structurally do my job, and I was more working and wanting to work with DEQ.

Q.   When you say "different types of treatment," you're referring to wastewater treatment?

A.   No.  I'm referring to the difference of how I was treated versus my coworkers.

Q.   And what were those differences that you reported to Carrol?

A.   I was told not to wear baseball hats, City-issued baseball hats of any kind, baseball hats at all.  I wasn't allowed to leave in the morning to even

go get coffee, which everybody did.  I was not, in general, allowed to leave the building unless I kept in complete contact with him.

And then eventually he -- he wouldn't even respond.  But if I had to go help Chelsey with a sampler at the other plant, at the industrial plant, which is you have to drive a little ways away to get to that, he would just come over and just sit, watch, and then would accost me for that.  He came out yelling at me.  I told her about that.  His abusive tone, his abusive face, his hostility.

Q.    Is that it?

A.    Yes.

Q.    And just to be clear, you did not at that time choose to report any of this alleged sexual harassment; correct?

A.    Correct.

Q.    Then after you left that meeting, the City, did they let you know they were going to do an investigation or anything like that?

A.    They said that they would bring Dee and Dustin in.  I had assumed that would be separately.  As it turned out, they were both put in the room together while that questioning was happening.  And Dee was told that he --

# EXHIBIT D

had not reported any of the issues you were having with Dee Hodge to Mark Mitton prior to 2020?

A.    No.

Q.    Anybody else at the City that you reported those sexual-harassment-type issues to?

A.    Jean Gorringe.

Q.    Okay.  Was that before her retirement?

A.    Yes.

Q.    Anybody else?

A.    Chelsey Ferrin.

Q.    Your coworker; is that right?

A.    Yes.

Q.    All right.  I need you to tell me what things you told Jean Gorringe prior to her retirement.

Which of those instances with Dee did you tell her about?

A.    I was not going to be comfortable going for rides with him.  I also told her I didn't like that he would lean in and get as close.  However, when I did report that to her, she like said to me, "You're going to have to deal with it, Girl.  You got to do what you got to do."

Q.    Anything else that Dee Hodge did that you reported to her, to Jean Gorringe?

A.    The deletion of my work.  She knew of that.

# EXHIBIT E

Q.   You're not sure on that one.  Okay.

And then did you have the opportunity to come in and produce information to the City on your behalf on February 10th at 8:30 a.m.?

A.   Yes.

Q.   Who was there at that meeting?

A.   Carrol Anderson, Dee Hodge, myself, and Dan Pherigo.

Q.   Anyone else?

A.   No.

Q.   Did you have the opportunity to say what you wanted to say?

A.   No.

Q.   Why not?

A.   I didn't want to lose my job.

Q.   So you didn't say anything?

A.   I did.  I spoke.  I said --

Q.   Okay.  Maybe I asked that question poorly.

I'm asking if the City gave you the chance to say what you wanted to say?

A.   Yes.

Q.   And it was your choice about how much you said; right?

A.   Yes.

Q.   If you withheld anything because you didn't

# EXHIBIT F

A.    I do not know.

Q.    You did not report them?

A.    I did not.

Q.    Okay.  Other than those two instances where you took the ride with Dee Hodge, were there other times that he asked you to go on a ride?

A.    Yes.

Q.    And what did you say in those instances?

A.    I would -- at that point, by the second time in the second incident of going the two times, I would ask the nature.  "Oh, you know, where to?" Because if it's pretreatment or lab or -- it's my supervisor, so if it's something I need to be aware of, and I would ask, and he'd say -- a typical comment would be, "I just want to show you some stuff.  Don't worry.  We won't be too long.  Jeani Bob doesn't mind going for rides with me."

I did talk to Jean about this.  She told me I would have to do what I have to do.  And that if I don't want to lose my job, "you're going to do what you need to do, girl."

Q.    And your response was?

A.    Took my breath away.

Q.    Was she implying that you were going to have to comply with inappropriate, sexual advances from

Dee Hodge?

A.    Yes.

Q.    At that point you were the lab tech; right?

A.    Yes.

Q.    This is before Jean retired?

A.    Yes.

Q.    I can see as you're sitting here you seem to be uncomfortable even making that statement.

Did you run to City Hall and tell anyone that "I'm not okay with this"?

A.    Coworkers.

Q.    Who?

A.    It was just conversations.  It wasn't that I would have to run to them, but I could -- if I made a comment to Glen, Rusty, Jean.

Q.    Did the City of Burley, do you know if they had a hotline you could call to speak with anybody if you were uncomfortable with a particular harassment situation?

A.    I don't recall.

Q.    Had you reviewed the City of Burley handbook, personnel manual?

A.    Yes.  Reviewed it every year.  I believe it's every year.

Q.    Were you aware of the reporting policy that

they have to report any conduct that you thought might be sexual harassment?

A.    Not exactly of the full -- no.  I'll say no.

Q.    Did you know anybody at HR, at human resources, at the City of Burley?

A.    Did I know them?  I did.

Q.    Who were they?

A.    Carrol Anderson.

Q.    Did you know her in the time that you worked at the City of Burley?

A.    Yes.  She started six months before I did.

Q.    Was she part of your hiring process?

A.    Yes, she was.

Q.    You're having a visible negative reaction to even her name.

Why is that?

A.    The last time I saw her she was standing on my son's wheelchair ramp to my home, and Dee was parked in front of my house.  And she handed me her letter that said "Here's Dee's decision."  And I looked up, and he just was looking right at me in my home.

Can I take a break?

MR. ANGELL:  That's fine.  Yeah, we can go off the record.

# EXHIBIT G

delete your work --

A.    Yes.

Q.    -- in retaliation for you leaning away from him when he would walk up behind you?

A.    That would be one of the things that he would do, yes.

Q.    And the other things are -- what else would he do?

A.    As far as?

Q.    Retaliation.

A.    The words, what he would say to me.

Q.    Such as?

A.    One moment.

"You're as deaf and dumb as -- I'm beginning to believe you are as deaf and dumb as Davin."  That's a coworker, Davin Trowbridge.

He would tell me I must have not been sowing my husband's oats, that's why I got a divorce.

After Jayden was injured, that's when it ramped up to comments of "How much goddamn longer is he going to be dependent on you?  Why do you need to go with him to a doctor's appointment?  He's not a goddamn 2-year-old, Lindsey.  I don't go with my kids to their doctor's appointments.  Why can't he go by himself.  If I had to live like that, I'd just kill myself.  If I

had to take care of somebody like that, I'd put him in a nursing home."

Q.    Anything else?

A.    Comments about my mom, her breast size, why weren't my boobs as big as my mom's.

"If I was Jayden, I would just kill myself. Must have not been doing a good job being a parent or probably Preston wouldn't have killed himself. Why do you have to help him go fill out SSI? Why do you have to help him go try to get enrolled for college? You know that at some point Jayden's going to end up killing himself because he has to live like that. You're going to end up having to wipe his ass, too, for him?" Those kind of things.

Q.    Was that all part of one rant, or how would that come up?

A.    After I would reject rides. Also it started with the leaning over the back of my chair, and then it turned into leaning over the chair and having his arms like this [indicating] over the -- he was over, hover. So I would lean and, you know, get my space back.

And then any time I -- or the time he came right up to me in the lab, stuck his whole hand down my shirt. I had sentimental rings from my grandma on a