UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LINDSEY YEAMAN, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>CITY OF BURLEY, an Idaho municipal corporation; and DEE HODGE, an individual,<br><br>        Defendants. | Case No. 4:21-cv-00345-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is a Motion for Summary Judgment (Dkt. 29) filed by Defendant City of Burley and Defendant Dee Hodge. For the reasons explained below, the Court will deny the motion.

## BACKGROUND[1]

### 1.    Alleged Harassment by Dee Hodge

---

[1] At the summary judgment stage, courts must view all evidence in the light most favorable to the non-moving party, without weighing the evidence or making factual determinations. Accordingly, although the Court must assume the truth of Yeaman's evidence for purposes of this Order, it makes no underlying determination as to the truth of the parties' allegations and evidence.

Plaintiff Lindsey Yeaman got a job as a lab technician with the City of Burley in May of 2014. *Yeaman Decl.* ¶ 3, Dkt. 30-2. After about a year, her department head and supervisor, Dee Hodge, began giving her what she perceived as unwanted sexual attention. *Id.* ¶ 7. For example, he made inappropriate comments to her while at work, such as remarking on her breast size, stating that her office pen looked like a "big ol' dildo," and attributing her divorce to her failure to do a "good enough job 'sowing [her] husband's oats.'" *Id.* ¶¶ 8, 9, 16.

As a lab technician, Yeaman worked under Hodge and Jean Gorringe, the Pretreatment Coordinator for the city's Wastewater Department. Leading up to Gorringe's retirement in July of 2018, Yeaman hoped to be promoted to the Pretreatment Coordinator position. *Id.* ¶ 26. According to Yeaman, Hodge capitalized on that hope by "dangl[ing] the possibility of [her] advancement to Pretreatment Coordinator as he made sexual advances." *Id.*

Moreover, as Gorringe's retirement neared, Hodge "intensified his sexual advances toward [Yeaman]." *Id.* ¶ 54. At times, he would "stand behind [Yeaman] while [she] was at her computer and dangle his arms over [her] or rest his hands on [her] arms when [her] arms were on the arm rest." *Id.* When Yeaman retracted from the touches, Hodge would comment that her "job was on the line," and that she had "better be careful" because she had not been officially promoted yet. *Id.*

According to Yeaman, Hodge's hostility toward her intensified the more she rejected his advances. *Id.* ¶ 75.

On one occasion, Yeaman reports that Hodge "reached his hand down [her] shirt . . . between [her] cleavage" and pulled up a ring which was at the bottom of her necklace. *Id.* ¶ 55. Another time, while Yeaman was alone in her office, Hodge entered, stood behind her, placed one hand on her lower back and the other on her hand, and asked her to go for a ride with him. *Id.* ¶ 67. Yeaman pulled away from him and asked where he wanted to go. He responded, "Does it matter? . . . Don't worry, I won't keep you for long." *Id.* ¶¶ 68–69. Yeaman understood Hodge to be requesting a sexual interaction. *Id.* ¶ 69. When she declined, Hodge "became angry" and "stormed out of the office." *Id.* ¶ 71. On the way out, he told Yeaman she had better be careful because Gorringe had not retired yet. *Id.* The implication, Yeaman understood, was that she may not be promoted if she continued rejecting Hodge's advances. *Id.*

In July of 2018, Gorringe retired and Yeaman was promoted to the position of Pretreatment Coordinator. *Id.* ¶ 61. Hodge did not make any sexual advances after Yeaman's promotion. *Yeaman Dep.* at 70:11–23, *Ex. A*, Dkt. 29-3. Instead, according to Yeaman, Hodge began intentionally making her job more difficult as punishment for rejecting his prior advances. *Yeaman Decl.* ¶ 75, Dkt. 30-2. She

reports that Hodge sabotaged her work by deleting files from her computer, frequently changed instructions for her assignments, and told her he would handle certain tasks, but then, "when the due date was near," put the responsibility on her. *Id.* ¶ 79. She also claims that Hodge "maliciously" provided the wrong materials for her to use in drafting sewer permits because he "wanted [her] to fail." *Id.* ¶ 103.

Although Hodge's overt sexual advances ceased in July of 2018, Yeaman perceived continued sexual undercurrents for the remainder of her employment. For example, sometime early in 2019, Hodge brought a mug into the office with the words, "so good with my rod I make fish come." *Id.* ¶ 13. Hodge "waived" the mug in Yeaman's face and kept it in his office for the rest of her employment. *Id.*

Finally, Hodge imposed "special rules" on Yeaman and treated her differently than her coworkers. *Id.* ¶ 78. For example, he told her not to close her office door or wear ballcaps, even though other employees wore ballcaps in the office. *Id.* ¶¶ 47, 78. He told her to adjust her shirt while others were around, but later told her to put it back "the way that it was . . . as long as it's just me and you in the office." *Id.* ¶¶ 59–60. He also did not allow her to leave the office on coffee breaks with her coworkers and demanded that she keep him informed of her whereabouts "at all times." *Id.* ¶ 78.

## 2.    Yeaman's Termination

On January 6, 2020, Yeaman went to City Hall to report Hodge's behavior to Carol Anderson, the city's Director of Human Resources. *Id.* ¶ 104. She recalls telling Anderson that Hodge had treated her "horrific[ally]" over the years and that "there was a lot to report." *Id.* ¶ 106. She explained that Hodge applied a different set of rules to her and had made highly offensive comments about her quadriplegic son. *Id.* ¶ 107. Yeaman also recalls telling Anderson that Hodge's treatment involved "harassment, bullying, sabotage, and isolation." *Id.*

As Yeaman went on, Anderson interrupted her and brought in Mark Mitton, the City Administrator. *Id.*¶ 108. Anderson told Yeaman to "repeat everything [Yeaman] had just told her." *Id.* But before Yeaman could do so, Mitton "cut [her] off and let [her] know he didn't have time to deal with it." *Id.* ¶ 109. The meeting ended, and "[n]either Mitton, Anderson, nor anyone at the City ever followed up." *Id.* ¶ 112.

One week later, on January 14, Yeaman received her first employee evaluation in over a year. *Id.* ¶ 123. Although Hodge did not personally complete the evaluation, he did provide "guidance" to the evaluator, Dustin Raney. *Raney Dep.* at 89:6–13, *Ex. C*, Dkt. 30-1. Yeaman's scores were "dramatically different" (lower) than any of her previous evaluations. *Yeaman Decl.* ¶ 125, Dkt. 30-2.

Shortly thereafter, on January 31, 2020, Hodge gave Yeaman a Proposed

Notice of Termination and told her that she was fired, effective immediately. *Id.* ¶ 126. Yeaman's final termination hearing was scheduled for February 10, 2020. *Id.* ¶ 131.

On February 3, before the termination hearing, Dan Pherigo, a coworker of Yeaman's, went to Anderson's office and reported Hodge's sexual harassment of Yeaman. *Pherigo Decl.* ¶ 4, Dkt. 30-3. That same day, the City hired Kerry McMurray to conduct an independent investigation into Pherigo's claims that Hodge sexually harassed Yeaman. McMurray was given six days to complete the investigation, and Yeaman and Pherigo were both placed on leave. *Anderson Decl.*, *Ex. H* & *Ex. I*, Dkt. 30-1.

Two things happened on February 10, 2020. First, McMurray completed his investigation, concluding that no sexual harassment had occurred, but recognizing some troubling behavior by Hodge. *Id., Ex. J* at 7–9. Second, Yeaman's termination hearing was held. Anderson, Hodge, Pherigo and Yeaman were present. *Anderson Decl.* ¶ 6, Dkt. 30-1. Yeaman spoke, explaining why Hodge's criticisms of her job performance were meritless. She did not, however, raise the issue of sexual harassment because she "could not see a reason to report to Hodge, [her] harasser, that he had harassed [her]." *Yeaman Decl.* ¶ 142, Dkt. 30-2. A few days later, Anderson delivered a final Notice of Termination to Yeaman's home.

3.    **This Lawsuit**

Yeaman filed a charge of discrimination with the Idaho Human Rights Commission on April 29, 2020. When those proceedings concluded, Yeaman filed this lawsuit in federal court on August 26, 2021, bringing federal and state discrimination claims and state claims for emotional distress. *Am. Compl.*, Dkt. 3.

Shortly after discovery closed in October of 2022, the defendants moved for summary judgment on all of Yeaman's claims. Dkt. 29. The Court held oral argument on March 14, 2023, and now denies the motion.

## LEGAL STANDARD

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact." *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016); Fed. R. Civ. P. 56(a). At the summary judgment stage, courts are not to "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, "where evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation omitted). All a court must do is to "determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249.

To survive summary judgment, a party must only provide evidence "such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the [party's] favor." *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015) (quoting *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).

## ANALYSIS

**1.     Yeaman's hostile work environment claim is not time-barred.**

Employment discrimination claims under Title VII of the Civil Rights Act must be brought "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).[2] Hostile work environment claims are unique because they typically involve "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Such claims are timely so long as "an act contributing to the claim occurs within the filing period." *Id.* Put another way, a hostile work environment claim "will not be time barred so long as all acts which

---

[2] Under certain circumstances, a claimant may have only one-hundred-and-eighty days to bring a Title VII claim. *See* 42 U.S.C. § 2000e-5(e)(1). In this case, however, all parties agree that the three-hundred-day limitation applies.

constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122. The act or acts falling within the limitations period are referred to as "anchoring acts."

Yeaman points to several potential anchoring acts, including Hodge's application of "special rules" to her and his sabotage of her work. She concedes, however, that all of Hodge's overtly sexual conduct occurred outside the limitations period. The question, then, is whether Hodge's more recent non-sexual acts can serve as anchoring acts that save Yeaman's claim from being time barred.

Defendants argue that anchoring acts for hostile work environment claims must be of "a sexual or gender-related nature." *Def.'s Suppl. Brief* at 2, Dkt. 35 (quoting *Menefee v. Montgomery Cnty. Bd. of Educ.*, 137 F.App'x 232, 233 (11th Cir. 2005)). But the Ninth Circuit has made clear that "there is no legal requirement that hostile acts be *overtly* sex- or gender-specific in content." *E.E.O.C. v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 845 (9th Cir. 2005) (emphasis added). Rather, "[w]hile sex- or gender-specific content is one way to establish discriminatory harassment, it is not the only way." *Id.* Accordingly, the important question here is not whether the anchoring acts were themselves overtly sexual, but instead whether they were "part of the same unlawful employment practice" as the prior, overtly sexual acts.

A reasonable jury could find that Hodge's pre- and post-July 4, 2019 conduct was intertwined. Yeaman argues that Hodge pursued a sexual relationship until she rejected his advances, at which point he turned to retribution as punishment for her rejections. That theory is supported by evidence that after Yeaman repeatedly rejected Hodge's advances, Hodge applied stricter rules to her than other employees, deleted files from her computer, and intentionally made her job more difficult.[3] These actions were not overtly sex- or gender-based, but considering all the circumstances, a jury could find that they were part of a campaign of harassment that began back in 2015 with Hodge's sexual advances and continued through the filing period with conduct intended to punish Yeaman for rebuffing those advances.

Yeaman's hostile work environment claim is therefore not time barred because acts contributing to the claim occurred within the filing period.

## 2.    Yeaman's emotional distress claims are not time-barred.

---

[3] Yeaman reports that Hodge continued to apply "special rules" to her until February 2020, including prohibiting her from wearing baseball caps, not permitting her to leave the office with coworkers for coffee breaks, making demeaning criticisms of her sick leave, and constantly demanding that she report her whereabouts to him. *Yeaman Decl.* ¶¶ 78, 104, Dkt. 30-2. Yeaman also alleges that, until sometime in the "second half" of 2020, she worked to draft a sewer permit based on a draft sewer ordinance that Hodge had "maliciously" provided to her because he "wanted [her] to fail." *Id.* ¶ 103.

A claim for emotional distress must be brought within two years after the events or occurrences underlying the claim. Idaho Code § 5-219(4); *see also Feltmann v. Petco Animal Supplies, Inc.*, No. 2:11-CV-414-EJL-MHW, 2012 WL 1189913, at *2 (D. Idaho Mar. 20, 2012). But emotional distress claims "often involve a series of acts over a period of time," rather than one single act. *Curtis v. Firth*, 123 Idaho 598, 604 (1993). Accordingly, the Idaho Supreme Court has noted that "the concept of continuing tort" applies to claims for emotional distress. *Id.* Under that theory, a claim is timely whenever the harmful conduct is "part of an unceasing stream of tortious acts" continuing into the limitations window. *Johnson v. McPhee*, 147 Idaho 455, 464 (Idaho Ct. App. 2009).

Yeaman claims that Hodge engaged in a continuous stream of offensive and harassing conduct, beginning with verbal and physical sexual advances, and morphing into hostility, isolation, and sabotage as she rejected those advances. Although many of the alleged incidents occurred more than two years before Yeaman brought this action, they were part of the stream of tortious acts underlying Yeaman's claim for emotional distress that continued until her termination in February of 2020. The Court therefore will not dismiss her emotional distress claims as untimely.

**3.      Defendants are not entitled to summary judgment on Yeaman's hostile work environment claim.**

Defendants first argue that only events occurring after July 4, 2019 (three-hundred days before Yeaman filed with the Idaho Human Rights Commission) may support Yeaman's hostile work environment claim. Then, looking only to those events, Defendants conclude that Hodge's conduct was not sufficiently severe or pervasive to create a hostile work environment.

The Court will proceed in two steps: first, addressing the proper scope of facts to be considered, and then analyzing whether those facts can support a hostile work environment claim.

### A.    Scope of Relevant Facts

According to the defendants, Yeaman's hostile work environment claim "can only be based on conduct that occurred after July 4, 2019." *Def.'s Memo. in Supp.* at 4, Dkt. 29-1. The Court disagrees for the same reason, explained above, that it concludes Yeaman's claim is not time-barred.

The U.S. Supreme Court made clear in *Morgan* that, when a hostile work environment claim is found to be timely, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117. In other words, there are not two different timeframes: one for analyzing timeliness and another for analyzing liability. There is only one timeframe: the one in which to *bring* a hostile work environment claim.

And when a plaintiff brings her action in time, the court may consider all conduct that was "part of th[at] same actionable hostile work environment practice," regardless of when it occurred. *Id.* at 120.

As explained above, Yeaman's claim is timely because some acts contributing to the allegedly hostile work environment occurred within the filing period. Moreover, the pre- and post-limitations period incidents were all part of the same challenged practice. Yeaman attributes all of the hostile conduct to the same supervisor and reports relatively frequent incidents of harassment and reprisal, all tying back to her rejection of Hodge's sexual advances. She is not challenging discrete acts of harassment, but rather the broader hostility of the workplace that arose from many related incidents of alleged harassment and reprisal. The Court cannot say that these pre- and post-limitations period incidents are not part of the same challenged hostile work environment practice.

## B.    Severity and Pervasiveness

The next question is whether a reasonable jury could find Hodge's conduct so severe or pervasive as to create a hostile work environment. The Court concludes that it could.

Title VII of the Civil Rights Act prohibits employment discrimination based on certain characteristics, including sex. 42 U.S.C. § 2000e–2(a)(1). One form of

actionable discrimination is the creation of a hostile work environment. An environment is hostile when the "atmosphere [is] so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). The environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

To bring a hostile work environment claim under Title VII, an employee must show "(1) that [s]he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (quoting *Pavon v. Swift Trans. Co., Inc.*, 192 F.3d 902, 908 (9th Cir. 1999)). The third element is often the most difficult to establish, because severity and pervasiveness are measures of degree that lack clear, concrete definitions.

In evaluating the degree of hostility in a workplace, a court must consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." *Kortan*, 217 F.3d at 1110 (cleaned up). A court must also be careful to avoid viewing the alleged acts and occurrences in a vacuum. Instead, the analysis requires "careful consideration of the social context in which particular behavior occurs and is experienced by its target . . . [and it] often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998).

While Title VII is not a "general civility code," persistent sexual advances and references can cross the line from rude to hostile. *Faragher*, 524 U.S. at 788 (quoting *Oncale*, 523 U.S. at 81). In drawing that line, courts often focus on two lodestars: severity and pervasiveness. "The required severity for 'harassing conduct varies inversely with the pervasiveness or frequency of the conduct.'" *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 649 (9th Cir. 2021) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008)).

Several Ninth Circuit cases provide helpful guidance. On one end of the spectrum, that court made clear in *Kortan v. California Youth Authority* that mere offensive comments made "in a flurry" on one occasion do not rise to level of hostility required under Title VII. *Kortan*, 217 F.3d at 1110–11; *see also Manatt v.*

*Bank of America*, 339 F.3d 792, 799 (9th Cir. 2003) (holding "simple teasing" and "offhand comments" were not actionable).

But the Ninth Circuit has also held that purely verbal harassment may be actionable when persistent. In *Draper v. Coeur Rochester, Inc*, a female employee claimed that over a two-year period, her male supervisor made repeated sexual remarks about her, frequently called her by pet-names, described his sexual fantasies and desire to sleep with her, told others it "would be fun to get into [her] pants," and asked once over a loudspeaker whether she needed help changing clothes. 147 F.3d 1104, 1105–06 (9th Cir. 1998). The plaintiff also claimed she was treated differently than her male coworkers, was not permitted to take breaks when other did, and was given unfavorable work assignments. *Id.* at 1106. The Ninth Circuit found that conduct sufficiently severe and pervasive to support her hostile work environment claim. *Id.* at 1109.

Physical harassment by a supervisor is even more likely to create a hostile work environment. In *Arizona ex rel. Horne v. Geo Group, Inc.*, a female employee claimed that her male supervisor "spanked" her buttocks on one occasion and was "always talking dirty." 816 F.3d 1189, 1206 (9th Cir. 2016). Her coworkers allegedly joined in the harassment by bumping into her, using profanity, and suggesting once that her bra had set off the metal detector. *Id.* at 1206–07.

MEMORANDUM DECISION AND ORDER - 16

Recognizing that each incident may not have been enough on its own, the Ninth Circuit held that the "cumulative effect" was sufficiently severe and pervasive for the claim to survive summary judgment. *Id.* at 1207.

Here, Yeaman easily satisfies the first two elements of her hostile work environment claim. She reports that, among other things, Hodge commented on her breast size, reached down her shirt, touched her while in the workplace, and requested that she accompany him on rides in his truck of an impliedly sexual nature. Each instance constituted unwelcomed harassment.

The remaining question is whether that harassment was sufficiently severe or pervasive to create an abusive environment and alter the conditions of Yeaman's employment. For several reasons, the Court concludes that Yeaman has raised triable issues on this question.

First, Hodge's conduct occurred over a period of nearly five years and involved many separate instances of alleged harassment, bullying, sabotage, and isolation. *Yeaman Decl.* ¶¶ 7, 78, Dkt. 30-2. This case is therefore unlike *Kortan*, where the supervisor's offensive comments were made in one burst on one day. Although Yeaman testified that Hodge's sexual advances ended in July of 2018, *Yeaman Dep.* at 70:6–23, *Ex. A*, Dkt. 29-3, she claims that his hostile treatment continued in the form of bullying, sabotage, and isolation—all in retribution for

rejecting his prior advances. *Yeaman Decl.* ¶ 107, Dkt. 30-2. By way of sabotage, Yeaman claims Hodge deleted data from her computer, *id.* ¶¶ 79, 135, changed task instructions just before deadlines, *id.*, and "maliciously" provided the wrong materials for her to use in drafting sewer permits, *id.* ¶ 103. By way of isolation, Yeaman claims Hodge applied "special rules" to her, such as prohibiting her from wearing baseball caps, *id.* ¶ 78, prohibiting her from taking coffee breaks with her coworkers, *id.*, constantly demanding that she inform him of her whereabouts, *id.* ¶¶ 78, 104, and prohibiting her from closing her office door, *id.* ¶ 47.

Second, Yeaman alleges both verbal and physical harassment. She describes one occasion where Hodge "stuck his whole hand down [her] shirt," *Yeaman Dep.* at 59:23–25, *Ex. G*, Dkt. 30-1, and grabbed the end of a necklace resting "between [her] cleavage." *Yeaman Decl.* ¶ 55, Dkt. 30-2. Another time, Hodge stood behind Yeaman when she was alone in her office, placed one hand on her lower back and the other on her hand, and asked her to go for a ride with him. *Id.* ¶¶ 67–68. At other times, Hodge would "stand behind [Yeaman] while [she] was at her computer and dangle his arms over [her] or rest his hands on [her] arms when [her] arms were on the arm rest." *Id.* ¶ 54. When Yeaman retracted from those touches, Hodge made comments to the effect that her "job was on the line." *Id.*

Third, the fact that Hodge was Yeaman's department head and supervisor

strengthens her claim that his conduct made the work environment hostile. "The Supreme Court has recognized that 'acts of supervisors have greater power to alter the environment than acts of coemployees generally.'" *Zetwick*, 850 F.3d at 445 (quoting *Faragher*, 524 U.S. at 805).

Finally, Yeaman's claim of experiencing mental and physical manifestations of distress support her position that Hodge's hostility was severe. Namely, she reports that his "outrageous and extreme" conduct "caused great mental strain" which led her to lose thirty-five pounds between November 2017 and January 2020 and required doubling her dosage of anxiety medication. *Yeaman Decl.* ¶ 151, Dkt. 30-2.

A reasonable jury could conclude that Hodge created an abusive work environment given the nature, frequency, persistence, and cumulative effect of his alleged conduct towards Yeaman. Summary judgement is therefore improper.

**3.      The City is not entitled to summary judgment under the *Faragher-Ellerth* defense.**

The City attempts to invoke the *Faragher-Ellerth* affirmative defense. Under that defense, an employer is not liable on a hostile work environment claim when there has been "no tangible employment action" and the employer can show: "(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the plaintiff unreasonably failed to take advantage

of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. 775. "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action*." Ellerth*, 524 U.S. at 745.

A "tangible employment action" is any significant change to a person's employment status, such as being hired, fired, demoted, overlooked for a promotion, given an undesirable reassignment, or undergoing a significant change in benefits. *Ellerth*, 524 U.S. at 761. For example, "[t]here is no question that a 'tangible employment action' occurs when a supervisor abuses his authority to act on his employer's behalf by threatening to fire a subordinate if she refuses to participate in sexual acts with him, and then actually fires her when she continues to resist his demands." *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1167 (9th Cir. 2003).

There are genuine disputes of fact as to whether the *Faragher-Ellerth* defense is available to the City. First is the question of whether Hodge's harassment "culminated in a tangible employment action." *Ellerth*, 524 U.S. at 765. The City claims Yeaman was discharged solely because of her poor job performance. But Yeaman defends her job performance and attributes her

termination to Hodge's anger over being rejecting. If the City is believed, Yeaman's termination was unrelated to the alleged harassment and the *Faragher-Ellerth* defense may be available. But if Yeaman is believed, Hodge's harassment did culminate in a tangible employment action—termination—and the *Faragher-Ellerth* defense is unavailable.

Even if the City could show that no tangible employment action was taken, there are genuine disputes of material fact on at least one other element of the *Faragher-Ellerth* defense. Yeaman argues that the City did not exercise "reasonable care" in preventing and promptly addressing her allegations of sexual harassment. She notes that Anderson and Mitton "interrupted" her and did not allow her to finish her report on January 6, 2020, *Yeaman Decl.* ¶ 108–09, Dkt. 30-2; *Pl.'s Resp.* at 16, Dkt. 29; that the City failed to follow its own written sexual harassment policy by not having Pherigo put his February 3 report in writing, *id.*; that the City put Yeaman and Pherigo on leave but allowed Hodge to continue working during the investigation, *id.*; that the City did not give the independent investigator enough time to complete a thorough investigation into the allegations of sexual harassment, *id.* at 17; and that the City allowed Hodge to attend Yeaman's termination hearing despite her reports of harassment. *Id.* at 16–17.

Viewing this evidence in the light most favorable to Yeaman, a reasonable

jury could conclude that the City failed to use "reasonable care" in preventing and addressing sexual harassment in the workplace. Summary judgment is therefore improper.

### 4. Defendants are not entitled to summary judgment on Yeaman's retaliation claim.

Title VII of the Civil Rights Act prohibits an employer from discriminating against an employee "because he has opposed" any "unlawful employment practice." 42 U.S.C. § 2000e-3(a). To prevail on a Title VII claim for retaliation, an employee must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment decision, and (3) there was a causal link between the two. *Bergene v. Salt River Project Agric. Improvement and Power Dist.*, 272 F.3d 1136, 1140–41 (9th Cir. 2001).

The familiar *McDonnell Douglas* burden-shifting framework applies to Title VII retaliation claims. *Id.*; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). Under that framework, a plaintiff bears the initial burden of making a prima facie case for retaliation. *Id.* The burden then shifts to the defendant to point to a "legitimate, nondiscriminatory reason" for the employment action. *Id.* Finally, the burden shifts back to the plaintiff who must demonstrate that the proffered reason was a mere pretext for unlawful discrimination. *Id.*

### A. Prima Facie Case for Retaliation

The first question is whether Yeaman engaged in a protected activity. The Court believes she did.

"An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates the law." *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013). Yeaman claims she engaged in protected activities on three occasions. First, when she reported Hodge's behavior to Anderson and Mitton on January 6, 2020. *Pl.'s Resp.* at 10, Dkt. 30. Second, when Pherigo reported Hodge's harassment to Anderson on February 3, 2020. *Am. Compl.* ¶ 78, Dkt. 3. And third, when she rejected Hodge's sexual advances in the workplace between 2015 and 2018. *Id.*

Yeaman did not engage in a protected activity on either of the first two occasions. First, she did not report any sexual harassment to Anderson or Mitton on January 6. And second, it was Pherigo, not Yeaman, who made the February 3 report of sexual harassment to Anderson. So it was not Yeaman who "engaged" in that activity.

Yeaman's third theory is that she engaged in a protected activity when she

rejected Hodge's sexual advances in the workplace.[4] This theory raises a legal question on which several federal appellate courts have split: does an employee engage in a "protected activity" when she rejects her supervisor's sexual advances? *Compare E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067–68 (6th Cir. 2015) (answering yes), *and Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (same), *with Frank v. Harris County*, 118 Fed.Appx. 799, 804 (5th Cir. 2004) (answering no). Although the Ninth Circuit has not squarely addressed this question, dicta from a 1988 decision comports with the Sixth and Eighth Circuits' approach. *See Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988).

In *Jordan v. Clark*, an employee sued her employer for Title VII retaliation, *inter alia*, and lost in a bench trial. *Id.* at 1371. On appeal, the Ninth Circuit considered her claim that she engaged in two forms of protected activity: (1) resisting her supervisor's sexual advances and (2) filing a complaint with the EEOC. *Id.* at 1376. Recognizing that the second activity was clearly protected, the court noted that "her alleged resistance to [her supervisor's] advances only qualifies as protected activity if [the] advances actually occurred and were an

---

[4] Yeaman's rejections included refusing to go on rides with Hodge in his truck for impliedly sexual purposes, *Yeaman Decl.* ¶¶ 68–71, Dkt. 30-2, and pulling away when Hodge put his hands on her in her office, *id.* ¶ 54.

'unlawful employment practice' under Title VII." *Id.* Given the district court's factual finding that the advances had not actually occurred, the Ninth Circuit affirmed the judgment against the employee. *Id.* Nevertheless, the court appears to have recognized that resisting sexual advances may itself constitute a protected activity.

This approach aligns with the statute's description of protected activity as involving "oppos[ition]" to an unlawful employment practice, or a practice the employee reasonably believes is unlawful. 42 U.S.C. § 2000e–3(a). "The term 'oppose' being left undefined by the statute, carries its ordinary meaning: 'to resist or antagonize ...; to contend against; to confront; resist; withstand.'" *Crawford v. Metropolitan Gov't of Nashville & Davidson Cnty., Tennessee*, 555 U.S. 271, 276 (2009) (citing Webster's New Int'l Dictionary 1710 (2d ed. 1958)). When an employee rejects her supervisor's sexual advances, she "opposes" those acts within the meaning of Title VII. Thus, so long as she reasonably believes the advances constitute unlawful discrimination, her resistance is a protected activity.

Turning back to this case, Yeaman reports pulling away from Hodge's physical touches and rejecting his requests to take rides with him in his truck. *Yeaman Decl.* ¶¶ 56, 68, Dkt. 30-2. Reasonably believing that Hodge's conduct violated Title VII's prohibition of sexual harassment, her verbal and physical

rejections of those advances constituted protected activity.

Defendants do not contest that Yeaman's discharge in February of 2020 was an "adverse employment decision," so Yeaman also clears the second hurdle for making a prima facia case of retaliation. Nor do Defendants challenge the causal connection between the protected activity and her termination. In sum, a reasonable jury could conclude that Yeaman has made a prima facie case for retaliation.

### B.  Burden-Shifting

Moving to the next step under *McDonnell Douglas*, the burden shifts to the defendants to point to some legitimate, non-discriminatory reason for firing Yeaman. There are several disputed factual issues surrounding Yeaman's termination.

Defendants report firing Yeaman because she was not doing her job well enough. *Hodge Decl.*, *Ex. A*, Dkt. 29-5. Hodge recalls making "multiple efforts to help her succeed, including coaching her and setting various goals for her to meet." *Hodge Decl.* ¶ 4, Dkt. 29-5. But Yeaman's story is very different. She claims Hodge intentionally and "maliciously" made her job more difficult by, for example, deleting files from her computer. *Yeaman Decl.* ¶¶ 103, 135, Dkt. 30-2. She also argues that the City's reason for firing her was pretextual because it could

not have realistically expected her to shoulder the workload she was given.

*Baumgartner Decl.* ¶ 10, Dkt. 30-4. [5]

Ultimately, crediting Yeaman's version of the facts, a reasonable jury could conclude that the City had no legitimate reason to fire her, or that any reason it did have was pretextual. Summary judgment is therefore improper.

### ORDER

**IT IS ORDERED that:**

1.   Defendants' Motion for Summary Judgment (Dkt. 29) is **DENIED**.

DATED: April 10, 2023

B. Lynn Winmill
U.S. District Court Judge

---

[5] The parties also disagree on when Hodge decided to fire Yeaman, which is relevant to whether Yeaman's or Pherigo's complaints to Anderson played any part in prompting her termination.

**MEMORANDUM DECISION AND ORDER - 27**